**UNTIED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

CYNTHIA SUE MARY, ET AL.  CIVIL ACTION NO. 13-2195

VERSUS  JUDGE S. MAURICE HICKS, JR.

QEP ENERGY COMPANY  MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court are three Motions: (1) Defendant QEP Energy Company's ("QEP") Motion to Strike (Record Document 88) the affidavits of Eric L. Glover ("Glover") and William J. Wood, Jr. ("Wood"); (2) QEP's Motion for Partial Summary Judgment (Record Document 49) seeking the dismissal of Plaintiffs Cynthia Sue Mary and Paul's Land Company, LLC's ("Plaintiffs" or "Marys") claims for a disgorgement of profits; and (3) Plaintiffs' Cross Motion for Partial Summary Judgment (Record Document 93) against QEP on the issue of QEP's bad faith, requiring a disgorgement of profits. For the reasons stated in the instant Memorandum Ruling, QEP's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART**; QEP's objection to the affidavit of Michael E. White is **SUSTAINED**; Plaintiffs' objection to the affidavit of Alaina Szlavy is **SUSTAINED IN PART** and **OVERRULED IN PART**; QEP's Motion for Partial Summary Judgment is **GRANTED**; and Plaintiffs' Cross Motion for Partial Summary Judgment is hereby **DENIED**.

## FACTUL AND PROCEDURAL BACKGROUND

On September 20, 2006, Paul E. Mary, III and Cynthia Sue Mary (the "Marys") entered into separate oil and gas leases (the "Leases") with Whitmar Exploration Company ("Whitmar") covering approximately 160 acres located in Section 14, Township

15 North, Range 10 West, Bienville Parish, Louisiana. <u>See</u> Record Document 1-3 at 1. The Leases granted Whitmar the right to explore for and develop oil and gas, and to conduct the operations reasonably incidental thereto, "including the use of the surface and a right-of-way for the collection of geological and geophysical data, the drilling of core samples, the installation of lease roads, the drilling and completion of oil and gas production wells, the laying of pipelines …to produce, save and deliver to market the oil and gas products produced from the leasehold premises." Record Document 49-4 at 1. Whitmar subsequently assigned all of its rights to Questar Exploration and Production Company on March 19, 2007, which subsequently became QEP. <u>See</u> Record Document 1-3 at 2.

In late 2009, each of the Marys entered into a Surface Use Payment and Release Agreement with QEP agreeing upon a location for the drilling pad for the Mary Et Al 14H No. 1 Well ("Mary Well") and for the construction of a road to service the Mary Well. <u>See</u> Record Documents 49-6 and 49-7. QEP paid $41,882.00 for the use of the service road described in the agreement. <u>See id</u>. On February 18 and 19, 2010, the Marys entered into a Pipeline Servitude Agreement with QEP pursuant to which the Marys granted QEP a thirty-foot wide permanent servitude for the installation of two gas and one saltwater pipelines, covering a distance of approximately 6,258 feet. <u>See</u> Record Document 49-8. QEP paid the Marys $189,645.00 pursuant to this Pipeline Servitude Agreement. <u>See id</u>. QEP spudded the Mary Well on August 12, 2010. <u>See</u> Record Document 1-3. at 3. The Marys and QEP then entered into a Subsurface Easement, pursuant to which the Marys granted an easement for the purpose of drilling three directional well bores beneath the Marys' property. <u>See</u> Record Document 49-9. QEP paid the Marys $30,000.00 for this

2

Easement. See id. On May 11, 2011, Paul E. Mary, III transferred all of his interest, including his mineral and lease rights, to the subject property to Paul's Land Company, L.L.C. See Record Document 1-3 at 3.

In July 2011, the Marys entered into an Amended Pipeline Servitude Agreement which amended the earlier Pipeline Servitude Agreement and granted QEP the right to install one additional above ground valve on its existing pipeline, paying $2,500.00 for this right. See Record Document 49-10. On July 22 and 26, 2011, the Marys entered into an additional Pipeline Servitude Agreement (the "Mary Pipeline Servitude"), which the Marys granted QEP an additional pipeline servitude covering a distance of approximately 147.55 feet. See Record Document 49-11. The purpose of this Pipeline Servitude was to allow QEP to connect the Pedro Wells, which were not located on the Marys' property, to the Mary pipeline which was on the Marys' property. See id. However, the gas pipeline "cut the corner" of the servitude granted by the Marys, and ran for a distance of approximately thirty-one feet outside the designated boundaries of the servitude. See Record Document 49-12. In addition, the saltwater pipeline deviated outside the Mary Pipeline Servitude for approximately fifteen feet. See id. These deviations are the subject of the instant Motions.

Plaintiffs originally filed suit on June 3, 2013, in the Second Judicial District of Bienville Parish, Louisiana. See Record Document 1-3. QEP removed the action by a Notice of Removal filed on July 2, 2013, based upon diversity of citizenship grounds. See Record Document 1. QEP filed its Motion for Partial Summary Judgment on March 24, 2016. See Record Document 49. QEP asks the Court to dismiss Plaintiffs' claims seeking a disgorgement of profits, and seeking an election by Plaintiffs as to whether to keep the pipelines located on their property or require their removal. See id. Plaintiffs originally

opposed QEP's Motion (Record Document 69), but subsequently filed its own Cross Motion for Partial Summary Judgment (Record Document 93) on June 16, 2016, asserting QEP acted in bad faith in constructing and possessing the pipelines located outside of the Mary Pipeline Servitude. QEP also moves to strike the affidavits of Glover and Wood, which were offered by Plaintiffs in opposition to QEP's Motion for Partial for Summary Judgment. See Record Document 88.

## LAW AND ANALYSIS

### I. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Rule 56 of the F.R.C.P. governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record, including . . . affidavits . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F.R.C.P. 56(c)(1)(A) and (B). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment." F.R.C.P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings  . . . [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett,

477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (U.S. 1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See Celotex, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (U.S. 1986); see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d 1069, 1075 (5th Cir. 1994).

Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

## B. FEDERAL COURT SITTING IN DIVERSITY

Since this case is before the Court under its diversity jurisdiction, the Court must apply the substantive law of Louisiana. See Bradley v. Allstate Ins. Co., 620 F.3d 509, 517 n. 2 (5th Cir. 2010), citing Erie R. R. v. Tompkins, 304 U.S. 64 (1938). The Fifth Circuit

in In re Katrina Canal Breaches Litigation stated the appropriate methodology to be applied by a Federal Court sitting in diversity in Louisiana:

> "To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. In the absence of a final decision by the Louisiana Supreme Court, we must make an Erie guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. In making an Erie guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them."

495 F.3d 191, 206 (5th Cir. 2007) (citations and internal quotation marks omitted).

However, diversity cases in federal court are governed by federal, not state, rules of evidence. See Fed. R. Evid. 101; Morris v. Homco Int'l, Inc., 853 F.2d 337, 341 (5th Cir. 1988), citing Hanna v. Plumer, 380 U.S. 460, 473-74, 85 S.Ct. 1136, 1145 (1965).

## I. ANALYSIS

### A. Motions to Strike

QEP moves to strike the affidavits of Glover and Wood on the grounds that the affidavits are not based upon personal knowledge, include opinion testimony the affiants are not qualified to render, include rank speculation and conclusory opinions, and include assertions regarding facts which are irrelevant. See Record Document 88-1 at 1. Although not included in its Motion to Strike, QEP also objects to the affidavit of Michael E. White ("White").[1] See Record Document 100 at 3. Plaintiffs, in turn, object to the affidavit testimony of Alaina Szlavy ("Szlavy"). See Record Document 69-36 at 10.

---

[1] It is not necessary to file a motion to strike a defective affidavit. It is sufficient to simply object. See Fed. R. Civ. P. 56; Cutting Underwater Technologies USA, Inc. v. Eerie U.S. Operating Co., 671 F. 3d 512, 515 (5th Cir. 2012).

###### i.    Affidavit of Glover

Glover is the owner and manager of Horizon Land Works, L.L.C. ("Horizon"), which has performed numerous surveys of pipeline servitudes for QEP, including the plat of survey attached to the Pipeline Servitude Agreement between the Marys and QEP. <u>See</u> Record Document 87 at 1. QEP asserts the affidavit fails to offer any basis for Glover's qualifications or expertise to opine about any issue relating to the survey, specifically Glover's opinion that "[i]t is also obvious from Winn's 'as built' survey that QEP and/or its contractor tried to 'rope' the pipelines into the pipeline servitude … This sort of installation would have saved QEP and/or its contractor money on pipe and fittings." <u>See</u> Record Document 88-1 at 5. QEP considers Glover's testimony as "rank speculation" and "opinions unsupported by information actually known to [the Affiant]." <u>Id</u>. Plaintiffs believe Glover's position as owner of Horizon qualifies him to give his opinions under Rule 701 of the Federal Rules of Evidence.

This Rule provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Under this Rule "a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the [fact finder]." <u>Texas A & M Research Found. v. Magna Trans., Inc.</u>, 338 F.3d 394, 403 (5th Cir. 2003). "In particular, the witness must have personalized knowledge of the facts underlying the opinion and the opinion must have a rational connection to those

facts." Id., quoting Mississippi Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373 (5th Cir. 2002). "[R]ule 701 does not preclude testimony by business owners or officers on matters that relate to their business affairs." Id.

In the instant case, the Court finds that Glover has not been shown to have personalized knowledge regarding the facts underlying his opinions on the issue of pipeline construction costs. Glover's opinion regarding this issue is based solely on the "as built" plat of survey made by Winn Surveying & Engineering, L.L.C., which shows the Mary pipeline "cutting the corner" of the L-shaped servitude. However, the affidavit does not show Glover has any knowledge regarding construction costs of pipelines. Nothing in the affidavit suggests Glover has any personal knowledge or expertise about what oil and gas operators do.

Plaintiffs believe Glover, as owner of Horizon and having performed numerous surveys for QEP, has acquired a "special knowledge of the considerations that influence oil and gas operators in their choices of routes. It takes no genius to know and understand that a shorter and more direct route for a pipeline 'saves money on pipe and fittings.'" Record Document 98 at 13. However, the Court does not allow Plaintiffs to draw this inference because Rule 701 allows business owners to offer opinion testimony on matters that "relate to *their* business affairs." Id. (emphasis added); State Indus. Prod. Corp. v. Beta Tech., Inc., 2008 WL 2230197, at *2 (S.D. Miss. 2008). Glover's opinion regarding the construction costs are based on matters that relate to the business affairs of QEP, not Horizon. Although it might not take a genius to form Glover's opinion, the affidavit fails to suggest how Glover would have any personalized knowledge to reach such a conclusion. Accordingly, the Court finds that Glover cannot testify as a lay witness on the issue of

pipeline construction costs in this case, and the Motion to Strike this testimony should be granted.

Glover's opinion that QEP "tried to rope" the pipelines is based on personal knowledge as established within the affidavit. Glover goes on to state that "Horizon would have never surveyed a pipeline route like that," and "if [Glover] and William J. Wood were to pull all of the pipeline surveys they completed for QEP, there was never a pipeline surveyed by them that has the bends in the pipeline routes." Record Document 87 at 3. As owner of Horizon, Glover has seen numerous pipeline surveys; he is engaged in the business of providing surveys to oil and gas operators, just like the one Horizon provided QEP here. Although not a surveyor, it is a function of Glover's own business to prepare and provide land surveys, thus Glover has the personal knowledge required to give his opinion regarding the "as built" survey to this extent. QEP's Motion to Strike this testimony is denied.

### ii.   Affidavit of Wood

Wood, a licensed and registered surveyor in Louisiana, is the owner of Wood Surveying, L.L.C. Wood has performed surveys for Horizon on previous accounts. In the instant matter, Wood supervised Chad E. Maricle, who surveyed and staked the pipeline servitude for QEP. QEP wishes to strike from the record Wood's opinion that "it is not unusual for an oil and gas operator to avoid sharp 90 degree turns or elbows on both gas and saltwater pipelines, as QEP has done here." Record Document 85-5 at 3. QEP believes Wood lacks personal knowledge or expertise about what oil and gas operators do. See Record Document 88-1 at 7.

Again, Wood may not testify to matters that do not relate to his business affairs. Wood's affidavit does not establish that he, as a surveyor, has any personal knowledge about what oil and gas operators do. Wood is attempting to give his opinion regarding the business affairs of QEP, not Wood Surveying, L.L.C. Accordingly, this statement must be stricken from Wood's affidavit.

### B. Affidavit Objections

#### i. Affidavit of Szlavy

Plaintiffs believe the affidavit of Szlavy must be disregarded as improper summary judgment evidence because she does not have personal knowledge of the relevant facts. See id. at 13. Plaintiffs argue Szlavy does not have personal knowledge because she admitted in her affidavit, "I was not present at the site during the construction of the Mary pipeline…." See id. Plaintiffs dispute Szlavy's personal knowledge with respect to three separate paragraphs in her affidavit. See id. at 13-14.

In Paragraph 17, Szlavy testified "I am not aware of any person who was employed by QEP deviating from a designated servitude or right of way either on Marys' property or anywhere else." Record Document 49-3 at 4. Plaintiffs suggest nothing in Szlavy's affidavit shows that she is in a position to know of any such deviation; while QEP asserts her position as a landman enabled her to be cognizant of deviations occurring. As part of her job as a landman, it was her responsibility to insure that QEP obtained the proper authority, whether pursuant to the terms of the lease or from an additional agreement, for the construction of wells and pipelines on the property of QEP's lessors. See id. Szlavy's job responsibilities, QEP contends, enabled her to have "personal knowledge of the relationship between QEP and Plaintiffs." However, Szlavy's knowledge of QEP and

Plaintiffs' relationship is insufficient to show she has personal knowledge of deviations occurring from designated servitudes. Accordingly, paragraph 17 of Szlavy's affidavit must be disregarded.

Plaintiffs next complain that Szlavy is not competent to testify to the statements contained in Paragraph 18, relating to whether QEP obtained a financial advantage by "cutting the corner" of the servitude. <u>See</u> Record Document 69-36 at 14. That paragraph, read in its entirety, reads as follows:

> With respect to the connection from the Pedro well, QEP did not obtain any financial advantage by laying this pipeline outside of the servitude as opposed to inside of it. QEP made no more money on the gas or saltwater transported through this pipeline than it would have made had the pipelines been constructed entirely within the servitude.

Plaintiffs attempt to persuade the Court that Szlavy attempted to provide an analysis of the costs of constructing the pipeline, but this simply is not true.

The "financial advantage" referred to by Szlavy is not the cost of constructing the pipeline, but rather the profit made by QEP. Szlavy testified based on her knowledge and experience as a landman that QEP did not make more money by transporting gas through a shortened pipeline than it would have made had the pipeline been constructed within the servitude. In fact, Szlavy acknowledged that she was not qualified to provide an estimate for the construction costs of a gas pipeline in her deposition. <u>See</u> Record Document 69-22 at 46. Plaintiffs' contention that Szlavy lacked the personal knowledge of the financial advantages of constructing a pipeline in one place or another is disregarded.

Lastly, Plaintiffs suggest that Szlavy was not competent to testify as she did in

Paragraph 19 that "QEP certainly did not enhance its profits by 'cutting the corner' of the servitude from the Pedro wells." <u>See</u> Record Document 69-36 at 14. As explained above, Szlavy was not addressing the costs of constructing a gas pipeline, but rather QEP's profits. Accordingly, Plaintiffs' objection to Szlavy's affidavit testimony in paragraph 19 has no merit.

### ii. Affidavit of White

Plaintiffs cited to White's affidavit in their Supplemental and Amended Statement of Facts in opposition to QEP's Motion for Partial Summary Judgment. <u>See</u> Record Document 94 at 3. Plaintiffs attempt to use White's testimony, specifically paragraph three, to show QEP benefitted from the location of the pipelines. <u>See id</u>. The relevant language of paragraph three reads as follows:

> It appears from the 'as built' surveys that the gas pipeline was constructed in essentially a straight line from the producing well complex to the east to west servitude line on the Mary property, without regard to the legal servitude granted by the Marys for that purpose. The saltwater pipeline, as shown by the 'as built' surveys, is curved, which substantially reduces the friction. This is obviously more convenient and beneficial to QEP than following the path of the legal servitude granted by the Marys. A comparison of the cost to build the existing lines versus the cost for construction of the lines had QEP followed the legal servitude was undertaken. The cost for constructing the existing lines was calculated to be $24,388.86. If the lines had been constructed within the legal servitude, the cost is estimated to have been $47,639.75.

QEP has objected to White's expert testimony for the following reasons: (1) White is not qualified to render the opinions set forth in his affidavit; (2) White offers opinions that are legal conclusions; and (3) White fails to set forth the methodology in support of his opinion regarding construction costs. <u>See</u> Record Document 64-1 at 2.[2] Plaintiffs

---

[2] QEP originally filed a Motion to Strike the White affidavit as it pertained to Plaintiff's Motion to Compel (Record Document 43). <u>See</u> Record Document 64. QEP has since objected to White's affidavit attached to Plaintiffs' Opposition to QEP's Motion for Partial Summary Judgment, which subsequently became Plaintiffs' Cross Motion for

argue the fact that White is not licensed as a civil engineer or as a surveyor in Louisiana does not disqualify him as an expert. <u>See</u> Record Document 120 at 5. Moreover, Plaintiffs believe White's opinions are within his scope of expertise and are relevant and reliable. <u>See id</u>. at 9.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 states that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if all of the following elements are met:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) the testimony is based on sufficient facts or data;
> c) the testimony is the product of reliable principles and methods; and
> d) the expert has reliably applied the principles and methods to the facts of the case.

This list of elements comes from <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 570 (1993), and its progeny. In <u>Daubert</u>, the Supreme Court stated that courts are required to serve as gatekeepers for expert testimony, ensuring that such testimony is both reliable and relevant before it is admitted into evidence. <u>See id.</u> at 589. Thus, requiring the proponent of a particular expert to satisfy the four elements stated in Rule 702 is aimed at ensuring that any purported expert testimony is both reliable and relevant. <u>See</u> Fed. R. Civ. P. 702, Notes of Advisory Committee on 2000 Amendments.

Certain factors should be considered in determining whether a particular expert's opinions are reliable:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective

---

Partial Summary Judgment. <u>See</u> Record Document 100 at 3. The White affidavit QEP objected to here is the same affidavit QEP originally moved to strike; therefore, the Court has taken into account QEP's original arguments in its Motion to Strike in analyzing QEP's current objection.

sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Id., citing Daubert, 509 U.S. at 593-95. This list of factors is non-exclusive, as the factors to be considered may vary depending upon the type of expert opinion at issue in a particular case. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-50 (1999). Relevance of expert testimony is a question of "fit," i.e., whether the expert testimony in question is well-suited to the issues of a particular case such that it will help the jury in deciding these issues or in understanding evidence that is outside the average juror's ability to understand absent such help. See Daubert, 509 U.S. at 591-92; see also In re Schooler, 725 F.3d 498, 514-15 (5th Cir. 2013) (affirming exclusion of expert testimony when the subject matter was within the common ability of jurors to understand without such testimony).

Though the trial court must fulfill its role as gatekeeper in ensuring that all admitted expert testimony is both reliable and relevant, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." United States v. 14.38 Acres of Land Situated in Leflore Co., Miss., 80 F.3d 1074, 1078 (5th Cir. 1996). "The rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Notes of Advisory Committee on 2000 Amendments. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 595.

The proponent of an expert's testimony bears the burden of proving that it meets the requirements of Rule 702. <u>Moore v. Ashland Chem., Inc.</u>, 151 F. 3d 269, 276 (5th Cir. 1998). Whether these elements are met is a preliminary question for the district court to decide under Fed. R. Evid. 104(a). A district court has wide latitude in deciding whether to admit expert testimony, and decisions on whether to admit or exclude such testimony are reviewed for abuse of discretion on appeal. <u>See</u> <u>Kumho Tire Co.</u>, 526 U.S. at 152-53.

QEP believes White is not qualified to render the opinions set forth in his affidavit because he is (1) not a licensed engineer in Louisiana and (2) not a licensed or registered surveyor. <u>See</u> Record Document 64-1 at 2. QEP cites no legal authority in support of its arguments. Plaintiffs argue White's lack of license does not disqualify his opinion; and further, White's education and experience in civil engineering, of which requires training in the principles and practices of land surveying, are sufficient to qualify White as an expert surveyor. <u>See</u> Record Document 120 at 8-9.

White graduated with a Bachelor of Science in Civil Engineering from the University of Arkansas and is a licensed professional engineer in Arkansas, Minnesota, and Tennessee. <u>See</u> Record Document 61 at 1. Plaintiffs argue White's employment at the Arkansas State Highway and Transportation Department as a Staff Survey Engineer, coupled with his education, makes White "thoroughly familiar" with the art and practice of surveying. <u>See id.</u> at 2. The Court agrees. It has long been established that a professional civil engineer is qualified to testify as an expert surveyor. <u>See</u> <u>Hall v. Barfield</u>, 92 So.2d 753 (La. App. 2 Cir. 1957), <u>Russell v. Producers Oil Co.</u>, 70 So. 92 (La. 1915), <u>Russell v. Producers Oil Co.</u>, 78 So. 473 (La. 1918).[3]

---

[3] This is a diversity action. Consequently, Louisiana law governs substantive matters while federal law governs procedure. The admissibility of evidence is a procedural matter. The admissibility of expert testimony is governed

Although White is qualified to offer surveying opinions, certain opinions nevertheless must be stricken from White's affidavit. White asserts two opinions which are outside of his expertise. After reviewing the two "as-built" surveys, White observes the pipeline is "curved, which substantially reduces the friction. This is obviously more convenient and beneficial to QEP than following the path of the legal servitude granted by the Marys." Record Document 69-9 at 2. "As a general rule, expert testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir. 1999). White's speculation that the pipeline's curvature obviously benefited QEP is not based on technical expertise, nor is it shown to be based on sufficient facts or data. He simply comes to this conclusion by looking at the 'as built' surveys. White has offered no reliable method or procedure to support his speculation that the curved pipelines were beneficial to QEP. Thus, this opinion testimony of White is inadmissible.

The Court's conclusion is bolstered by the fact that White's opinion was premised on an unreliable calculation of construction costs. To support his opinion that the selected path was more beneficial to QEP, White provided a comparison of construction costs. He found "[t]he cost for constructing the existing line was calculated to be $24,388.86. If the lines had been constructed within the legal servitude, the cost is estimated to have been $47,639.75." Record Document 69-9 at 2. However, White's calculations are unreliable for two reasons: (1) he fails to set forth the underlying basis for his conclusions regarding

by Federal Rule of Evidence 702. However, decisions by Louisiana courts on the admissibility of expert testimony apply the same standards required by Fed. R. Evid. 702. See State v. Foret, 628 So. 2d 1116, 1121 (La. 1993) ("[La. C.E. art. 702] is virtually identical to its source provision in the Federal Rules of Evidence, F.R.E. 702"). Thus, the Court finds the relevant decisions of Louisiana courts are persuasive authority.

the cost of pipeline construction, and (2) his opinion has been supplanted by further calculations not included in his affidavit.

First, the White affidavit contains no underlying basis for his calculation. There is no information as to how White arrived at these figures, all that is mentioned is there was "a comparison of costs." There is no indication that he contacted construction or supply companies to determine the cost of labor, material, rental rates for equipment or any other factors which might have impacted the cost of construction. White's affidavit simply offers no analysis of what he did or what he relied upon in reaching his conclusion regarding the cost of construction.

Plaintiffs argue questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. See United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss., 80 F.3d 1074, 1077 (5th Cir. 1996). However, in 14.38 Acres, the two experts in question offered much more in support for their conclusion. The experts had shown they had reviewed maps, photographs, and data; inspected the property; discussed with other experts; and compared other sales. See id.  Here, White does nothing of the sort, only stating, "A comparison of the cost…was undertaken." Record Document 69-9 at 2. As Plaintiffs state in their brief, "the focus of the 'gatekeeper' under Rule 702 'must be solely on principle and methodology, not on the conclusions they generate.'" Record Document 120 at 9, citing Daubert, 509 U.S. at 595, 113 S.Ct. at 2797. However, the Court cannot focus on the methodology when there is none. Put simply, the White affidavit offers no factual or analytical support whatsoever.

Second, White's calculation of costs has since been revised. The calculations in the White affidavit were provided on March 31, 2016. Following the White affidavit, QEP deposed Dr. Jerry Overton ("Overton") of ATOKA, the firm which employs White, on July 16, 2016. <u>See</u> Record Document 121-1. When asked about White's calculations regarding the pipeline construction costs, Overton admitted, "this was our original cost…It's been revised." <u>Id</u>. at 3. Overton stated that White's original estimates were based upon the entire length of the pipelines and not just the portion that ran through the Marys' property. <u>See id</u>. Since White offers no methodology to support his opinion and his calculations are admittedly inaccurate, the Court finds White's expert testimony unreliable and inadmissible.

Although White is qualified as an expert to testify as a surveyor, such expertise does not enable him to offer conclusions which are not supported by any sufficient facts or data. Moreover, the comparison of construction costs is unreliable because it lacks *any* underlying basis to support the calculations, and further, it is admittedly inaccurate and has since been revised. For these reasons, the objected-to portions of paragraph three must be disregarded.

## C. Cross-Motions for Partial Summary Judgment

Having addressed QEP's Motion to Strike and the parties' objections to certain affidavits, the Court is now ready to consider the cross-motions for partial summary judgment. QEP seeks partial summary judgment dismissing Plaintiffs' claims to the extent they seek a disgorgement of profits or an election by Plaintiffs as to whether to keep the pipelines located on their property or require their removal. Each of these remedies requires a finding that QEP acted in bad faith in placing the gas and saltwater pipelines

outside the designated servitude. <u>See</u> Record Document 49. Plaintiffs originally opposed

QEP's Motion for Partial Summary Judgment (Record Document 69), but have since filed

their own Cross Motion for Partial Summary (Record Document 93) asserting there exists

no genuine dispute to the fact that QEP acted in bad faith. As will be explained more fully

below, the Court finds QEP did not act in bad faith.

### i.    The Pipelines at the Pedro Well Connection

Plaintiffs contend QEP was in bad faith when it located portions of the saltwater

and gas pipelines which connect the Pedro well to the Mary pipeline outside the servitude

which was specifically granted for that purpose.[4] <u>See</u> Record Document 93. QEP argues

there is no factual support for Plaintiffs' claim that it acted in bad faith. <u>See</u> Record

Document 49.

The underlying legal theory for Plaintiffs' claim for disgorgement of profits is La.

Civ. Code art. 486, which provides:

> A possessor in good faith acquires the ownership of fruits he has
> gathered. If he is evicted by the owner, he is entitled to reimbursement of
> expenses for fruits he was unable to gather.

> A possessor in bad faith is bound to restore to the owner the fruits
> he has gathered, or their value, subject to his claim for reimbursement of
> expenses.

La. C.C. Art. 486. Likewise, in <u>SGC Land, LLC v. Louisiana Midstream Gas Servs.</u>, 939

F.Supp.2d 612 (W.D. La. 2013), <u>amended on reconsideration in part</u> (Aug. 3, 2013), this

Court noted:

---

[4] QEP also states Plaintiffs contend QEP acted in bad faith by locating pipelines underneath the Mary well pad, rather than within the separate pipeline servitude which they later granted to QEP. <u>See</u> Record Document 49-1 at 11. However, Plaintiffs do not argue this act constituted bad faith in any of their briefs, focusing their argument of bad faith only on the pipelines at the Pedro well connection. Accordingly, the Court will only address the pipelines at the Pedro well connection in its analysis of bad faith.

> Under Louisiana law, the remedy of disgorgement of profit is available upon the showing of bad faith possession.... The question whether a possessor be in good faith or in bad faith (legal or actual) is the sole factor in determining whether such possessor should or should not account for the fruits of his possession. This doctrine stems from La. C.C. art. 486 which provides in part that a possessor in bad faith is bound to restore to the owner the fruits he has gathered, or their value.

Id. at 619 (internal citations and quotations omitted). Just as in SGC Land, there is no competent evidence in the summary judgment record proving or indicating that the ultimate location of the pipeline involved bad faith.

The Court finds SGC Land extremely persuasive in the instant matter as both cases involve almost identical facts. In SGC Land, the parties had entered into not only mineral leases, but additional easements for construction, operation, and maintenance of a pipeline, with no restrictions preventing or limiting the pipeline from being used to transport third party gas. See id. at 614-15. There, Midstream constructed less than thirty feet of the pipeline approximately four feet outside the designated area, and the landowners filed suit for trespass, seeking a disgorgement of profits. See id. at 616.

The court found the SGC Land plaintiffs failed to present any evidence showing legal bad faith on the part of Midstream in the construction or operation of the pipeline. See id. at 620. "Midstream specifically negotiated an agreement with the plaintiffs for the sole purpose of transporting third party gas and attempted to construct the pipeline in accordance with such." Id. In further support of its ruling, the Court noted the plaintiffs "have not provided any evidence demonstrating any advantages, financial incentives, or profits which would motivate the deviation of four feet from the agreed upon right of way. Chesapeake (Midstream) did not receive any additional profits attributable to placing the pipeline slightly outside the planned path." Id. The Court also considered the lack of

damage sustained by the plaintiffs in its ruling in favor of Midstream/Chesapeake, ruling, "This Court is not inclined to resort to the harsh remedy of requiring either the destruction of the encroaching pipeline or the disgorgement of profits under the circumstances provided." Id. at 619.

QEP admittedly located portions of the saltwater and gas pipelines which connect the Pedro well to the Mary pipeline outside the servitude which was specifically granted for that purpose. The gas and saltwater pipelines run outside the servitude for a distance of thirty-one feet and fifteen feet, respectively. However, this alone is not sufficient to prove bad faith. The Court also finds Plaintiffs, like the plaintiffs in SGC Land, "have not provided any evidence demonstrating any advantages, financial incentives, or profits" which would motivate QEP's deviation of forty-six feet.

As shown above, Plaintiffs have gone to great lengths to produce any evidence whatsoever of bad faith; however, Plaintiffs' attempts are futile. The only conceivable bad faith evidence Plaintiffs have provided is that QEP "tried to 'rope' the pipelines into the pipeline servitude." Record Document 88-1 at 5. However, Plaintiffs have not introduced any evidence to show how/why "roping" the pipelines would be advantageous to QEP. Likewise, Plaintiffs fail to introduce any evidence of any financial incentive or additional profit which would have motivated QEP to deviate from the designated servitude. In fact, Szlavy's affidavit testimony states the exact opposite, "QEP did not obtain any financial advantage by laying this pipeline outside of the servitude as opposed to inside of it. QEP made no more money on the gas or saltwater transported through this pipeline than it would have made had the pipelines been constructed entirely within the servitude." Record Document 49-3 at 5. Additionally, a review of the evidence shows QEP erred on

the side of caution in exercising its rights upon Plaintiffs' property. On multiple occasions QEP obtained additional rights beyond those granted under the Leases, and paid substantial sums of money for those rights before conducting activity on Plaintiffs' property.

Just as in <u>SGC Land</u>, Plaintiffs are also unable to demonstrate any damages sustained because of QEP's misplacement of the pipelines. When asked by opposing counsel, neither Plaintiff could identify a single element of damage they suffered. <u>See</u> Record Document 57-1 at 14; Record Document 57-2 at 10. Plaintiffs have failed to present sufficient evidence to show any advantages, financial incentives, or profit to motivate QEP's deviation, nor have Plaintiffs presented any evidence of any damage actually suffered by Plaintiffs as a result of QEP's deviation. For these reasons, the Court "is not inclined to resort to the harsh remedy of requiring either the destruction of the encroaching pipeline or the disgorgement of profits under the circumstances provided."

In another attempt to prove QEP's bad faith, Plaintiffs suggest the Civil Code articles on accession and acquisitive prescription should apply to the determination. <u>See</u> Record Document 90 at 6. La. Civ. Code art. 487 provides:

> For purposes of accession, a possessor is in good faith when he possesses by virtue of an act translative of ownership and does not know of any defects in his ownership. He ceases to be in good faith when these defects are made known to him or an action is instituted against him by the owner for the recovery of the thing.

Plaintiffs contend QEP cannot be found in good faith under this article because (1) QEP does not possess a pipeline servitude over the property on which the pipeline is located by an act of translative ownership and (2) QEP knew or should have known that the

pipelines were being constructed outside the of the limits of the pipeline servitude granted by the Marys.[5] See Record Document 90 at 6-7.

However, an analysis of Article 487 under these facts is unnecessary because this Court, and numerous Louisiana appellate courts, have expressly rejected the applicability of the Civil Code's accession articles to the type of encroachment action being asserted by Plaintiffs in this case. In SGC Land, the plaintiffs asserted a virtually identical claim based upon the defendant's construction of a pipeline outside an agreed upon right-of-way. See SGC Land, 939 F.Supp.2d 612. The plaintiffs sought damages for disgorgement of profits based upon the defendant's alleged trespass on their property. See id. at 616. In analyzing these claims, this Court observed that under Louisiana law, a civil trespass is the "unlawful invasion of the property or possession of another." Id. at 619, citing Boudreaux v. Plaquemine Parish Government, 22 So.3d 1117, 1118 (La. App. 4 Cir. 2009). The Court found there was no question that defendant Chesapeake was authorized to construct the pipeline virtually anywhere on the property in order to service wells located therein, and "therefore did not unlawfully invade Plaintiffs' property with respect to the placement of the pipeline…The Court does not believe Chesapeake trespassed onto Plaintiffs' land when it transported third party gas through the minor deviation in the pipeline's agreed upon path." Id. Rather than analyzing the defendants' liability under the provisions of Article 487, this Court found "the more appropriate analysis

---

[5] Plaintiffs also argue QEP cannot be found in good faith after this lawsuit was filed. See Record Document 69-36 at 19. Plaintiffs' assertions are based on the language of Article 487, "he ceases to be in good faith when…an action is instituted against him by the owner for the recovery of the thing." However, as will be discussed more fully below, the definition of good faith found in La. Civ. Code art. 487 is not applicable to encroachment under La. Civ. Code art. 670.

regarding damages stems from the doctrine of encroachment" found in La. Civ. Code art. 670:

> When a landowner constructs in good faith a building that encroaches on an adjacent estate and the owner of that estate does not complain within a reasonable time after he knew or should have known of the encroachment, or in any event complains only after the construction is substantially completed the court may allow the building to remain. The owner of the building acquires a predial servitude on the land occupied by the building upon payment of compensation for the value of the servitude taken and for any other damages the neighbor has suffered.

SGC Land, 939 F.Supp.2d at 620.

Louisiana state courts have similarly rejected the applicability of the Civil Code articles on accession to landowner claims of encroachment. In Winingder v. Balmer, 632 So.2d 408 (La. App. 3 Cir. 2013), the court expressly rejected the same claim now being asserted by the Plaintiffs, that the defendants could not be in good faith without an act translative of title:

> Plaintiffs base their argument on the definition of "possessor in good faith" found in Civil Code art. 487. We disagree. That article requires the good faith possessor to possess by virtue of an act translative of title. The opening language of art. 487 restricts that definition of good faith solely "for the purposes of accession . . ." Art. 670 does not appear in the same title of the Civil Code as art. 487. Accordingly, the definition of good faith found in art. 487 is not applicable to the provisions of art. 670.

Id. at 414, citing Bushell v. Artis, 445 So.2d 152 (La. App. 3d Cir. 1984); Theresa Seafood, Inc. v. Berthelot, 40 So.3d 132 (La. App. 4 Cir. 2010) (analyzing art. 670 to deny demolition where the record showed the encroachments were in place for several years prior to the lawsuit, and neither party was aware of the encroachments until a survey was conducted in connection with the lawsuit).

The Court in SGC Land found that Chesapeake built its pipeline structure in good faith on adjacent land without complaint by the plaintiffs about the encroachment prior to

the pipeline being substantially completed. This Court found that as a matter of law, Chesapeake was entitled to a predial servitude on the reasonable areas surrounding the pipeline, subject to its obligation to pay "fair compensation" for the value of the servitude.

Here, the Leases granted QEP a lease on the entirety of the 160 acres of property the Marys owned, and included "the use of the surface and a right-of-way for the collection of geological and geophysical data…the installation of lease roads…the laying of pipelines…to produce, save and deliver to market the oil and gas products produced from the leasehold premises." As in SGC Land, QEP was authorized to construct the pipelines anywhere on the property. While the Mary Pipeline Servitude did establish a set location to place the pipeline in order for it to transport third-party gas, the Court, as it held in SGC Land, does not believe QEP trespassed onto Plaintiffs' land when in transported third-party gas through the thirty-one-foot deviation in the pipeline's agreed upon path.

Applying Article 670 to the instant case, QEP, considered a landowner based on their rights acquired from both the Leases and the additional pipeline servitude, built structures[6] in good faith on adjacent land, without complaint by the Plaintiffs until the pipeline had actually been in use for years. As this Court found as a matter of law in SGC Land, QEP is entitled to a predial servitude of the reasonable area surrounding the pipelines located outside the agreed upon right of way in which the pipelines have been constructed.

As an added alternative justification for today's ruling, this Court proceeds in equity under La. Civ. Code art. 4. Even if QEP's construction of the pipelines did not satisfy each of the technical requirements of Article 670, no reasonable juror could find that QEP acted

---

[6] See Winingder v. Balmer, 632 So.2d 408, 411 (La. Ct. App. 1994); Lakeside Nat. Bank of Lake Charles v. Moreaux, 576 So.2d 1094, 1098 (La. Ct. App. 1991).

in bad faith in constructing the pipelines. There is no competent evidence in the record proving or indicating that the ultimate location of the pipelines involved bad faith. Furthermore, Plaintiffs have been unable to identify any damage suffered from the slight deviation of the pipelines outside the designated right of way. Accordingly, this Court is not inclined to resort to the harsh remedy of requiring either the destruction of the encroaching pipelines or the disgorgement of profits under the circumstances presented. QEP's Motion for Partial Summary Judgment is granted and Plaintiffs' Cross Motion for Partial Summary Judgment is denied.

## CONCLUSION

QEP's Motion to Strike (Record Document 88) the affidavit testimony of Glover and Wood is hereby **GRANTED IN PART** and **DENIED IN PART**. Additionally, QEP's objection to the affidavit of Michael E. White is **SUSTAINED** and Plaintiffs' objection to the affidavit of Alaina Szlavy is **SUSTAINED IN PART** and **OVERRULED IN PART**. QEP's Motion for Partial Summary Judgment (Record Document 49) dismissing Plaintiffs' claims seeking a disgorgement of profits is **GRANTED** as there is no competent evidence in the record that QEP acted in bad faith. The removal of the pipelines is not required. Consequently, Plaintiffs' Cross Motion for Partial Summary Judgment (Record Document 93) is **DENIED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this the 6th day of December, 2017.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT